# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cr-00095** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **ALEXANDER FRIEDMANN** | ) | |

## MEMORANDUM

Before the court are three motions to suppress certain evidence obtained by officers with the Metropolitan Nashville Police Department ("MNPD") during their investigation of state charges against defendant Alexander Friedmann: (1) Motion to Suppress Fruits of Judicial Subpoena (Doc. No. 42); (2) Motion to Suppress Fruits of Illegal Search and Seizure from 270 Tampa Drive (Doc. No. 41); and (3) Motion to Suppress Fruits of Illegal Search and Seizure from 7862 Whites Creek Pike (Doc. No. 40). For the reasons set forth herein, all three motions will be denied.

## I. LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. To secure this right, the Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *Id.* "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). And an affidavit—serving as an oath or affirmation—"must contain adequate supporting facts

about the underlying circumstances to show that probable cause exists." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996).

When a magistrate judge makes a probable cause determination, she only needs to "make a practical, common-sense decision," given the totality of the facts. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate judge must find only a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* And, when reviewing a search warrant, courts must give "great deference" to the magistrate judge's determination while ensuring that she "had a substantial basis for concluding that probable cause existed." *Id.* at 236, 238–39 (alterations omitted). A magistrate judge's probable cause determination "should be reversed only if arbitrarily made." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006).

To bring a Fourth Amendment challenge to a search or seizure in the first place, however, the defendant must show that he had "a legitimate expectation of privacy in the place searched or the thing seized." *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (citations omitted).[1] The "determination of whether a defendant has such a legitimate expectation of privacy involves a two-part inquiry." *Id.* First, the court asks "whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private." *Id.* (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)). Assuming the answer

---

[1] Despite the pervasive use of the term "standing" in both the briefing on motions to suppress and district court opinions, the Supreme Court has expressly held that, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)); *accord United States v. Britton*, 335 F. App'x 571, 574 (6th Cir. 2009) ("[C]haracterizing the question as one of 'standing' miscasts the issue." (citing *Rakas*, 439 U.S. at 139–40)).

to that question is "yes," the court must then ask "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (quoting *Bond*, 729 U.S. at 338).

This second inquiry requires reference to "a source outside of the Fourth Amendment"—either "to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143 n.12. Courts have considered a number of factors in identifying expectations that qualify for Fourth Amendment protection, the most obvious of which is an individual's "proprietary or possessory interest in the place to be searched or item to be seized." *King*, 227 F.3d at 744. However, the existence of a property right alone is "not determinative of whether the individual reasonably expected 'freedom from governmental intrusion.'" *Id.* (quoting *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968)). "Other factors include whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." *Id.* (citations omitted). The determination of whether a defendant has a legitimate expectation of privacy in a particular place or item must be made on a case-by-case basis. *King*, 227 F.3d at 743.

## II.     PROCEDURAL AND FACTUAL BACKGROUND

### A.     The Criminal Complaint

The Criminal Complaint initiating this federal case against defendant Alexander Friedmann was filed on May 26, 2020. (Doc. No. 1.) Friedmann was indicted on June 7, 2021 on a single federal charge of being a felon in possession of numerous firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Doc. No. 16).

The convoluted facts that led to the indictment are set forth in the Affidavit filed in support of the Criminal Complaint. According to the Affidavit of FBI Agent Keith Sutherland, the

Davidson County Sheriff's Office ("DCSO") began the demolition of the Metropolitan Nashville Criminal Justice Center in downtown Nashville and the construction of the new Downtown Detention Center ("DDC") in 2016. (Sutherland Aff. ¶ 5.) In late 2019 and early 2020, when the DCSO had "taken over the physical security of the DDC as the facility was being prepared to be made operational in January 2020," law enforcement investigators determined that Alexander Friedmann had "surreptitiously gained access" to the DDC while it was under construction. (*Id.* ¶ 4.) Friedmann was arrested by MNPD officers on January 4, 2020 and charged with burglary, possession of burglary tools, and evidence tampering, in violation of Tennessee law. (*Id.* ¶ 17.) Friedmann made bond the same day.

Subsequent investigation allegedly revealed that Friedmann, while inside the facility and dressed as a construction worker, had "secreted a number of weapons—including firearms—inside the walls of the facility." (*Id.* ¶¶ 4, 6, 21–31.) Based on this discovery, a search warrant for Friedmann's residence was issued and executed on February 14, 2020, but no ammunition or firearms were located there. On February 18, 2020, a Davidson County Grand Jury indicted Friedmann on a state charge of vandalism causing damage of $250,000 or more. This indictment was made public on February 18, 2020. (*Id.* ¶¶ 34–35.)

The Affidavit of Complaint further alleges that MNPD Detective Robert Anderson was contacted by an individual identified in the Affidavit only as "G.T.," who "advised that G.T.'s office had previously provided notary services for Friedmann." (*Id.* ¶ 37.) G.T. also told Detective Anderson that it was his office's practice to "photocopy what they notarized, and that, based on what they had notarized for Friedmann, it was believed that Friedmann had a storage building." (*Id.* ¶ 38.) Detective Anderson later procured and served a judicial subpoena on the Gary Temple Law Office on Gallatin Pike in Nashville. (*See* Doc. No. 42-1 (Application for Judicial Subpoena

and Judicial Subpoena).) As a result of this Subpoena, Detective Anderson obtained copies of the documents Friedmann had had notarized at that office.

Among other documents obtained from the Gary Temple Law Office was a notarized "Letter of Authorization" from Friedmann to Greg Hall, instructing Hall that, upon the event of Friedmann's untimely death, an individual Friedmann identified as "Ferris Mar" had permission to "pick up and remove the property [Friedmann] ha[d] in storage in the M Building workshop area at the Harding Glen Condos, 270 Tampa Drive in Nashville." (Doc. No. 41-3 (Letter of Authorization); *see also* Sutherland Aff. ¶ 39.)

Based on the information in the Letter of Authorization, Detective Anderson went to the condominium complex at 270 Tampa Drive and spoke with Greg Hall. Then, based on additional information conveyed by Hall, Anderson obtained a warrant to search a storage area located in the shop under the "M Building" at 270 Tampa Drive. (Sutherland Aff. ¶ 59; *see also* Doc. No. 41-1 (Affidavit and Search Warrant for 270 Tampa Drive, Unit Building M).) Anderson, with other law enforcement officers, executed this search warrant on March 13, 2020.

Further investigation into the identity of "Ferris Mar" led police to a residence located at 7862 Whites Creek Pike in Joelton, Tennessee, where they spoke with April Marone. Police ultimately obtained a warrant to search the premises at 7862 Whites Creek Pike, which was executed on March 20, 2020. Police discovered numerous crates stored at this residence by Friedmann, with Marone's permission. The crates contained law enforcement equipment, ammunition, and firearms, including fourteen pistols of various brands, several shotguns and assault rifles, and a "launcher (shooting flare, gas, or smoke rounds)." (Sutherland Aff. ¶ 75.)

The felon-in-possession charge against Friedmann is premised upon the items uncovered at 7862 Whites Creek Pike. Following his federal indictment, Friedmann, through counsel, filed

the three Motions to Suppress now before the court. The government filed responses opposing each motion. (Doc. Nos. 67, 68, 69.)

### B. Hearing Testimony

#### 1. *Testimony Concerning the Judicial Subpoena*

The court conducted an evidentiary hearing on February 16, 2022 on the three motions. At this hearing, the government called Aimee Bobbitt as its first witness. Bobbitt testified that she is a self-employed attorney in Nashville, and she previously worked out of the Gary Temple Law Office. She is also a notary public and has been a notary for more than ten years. Generally, according to Bobbitt, the Gary Temple Law Office provided notary services to non-client members of the community at no charge. If an individual walked into the office requesting notary services and Bobbitt was there, she would notarize the documents. Her standard practice, in providing free notary services to community members, was to require the individuals requesting such services to produce identification, typically a driver's license, and to sign in her presence the documents they wanted notarized. Bobbitt would then notarize the person's signature by affixing her seal to the documents.

Bobbitt testified that she would tell the individuals, in advance, that, to have documents notarized, they would have to produce identification and that she would make a copy of their identification *and* a copy of the documents she notarized. If the individuals had a problem with her doing that, then she would not notarize the documents. Asked why she made copies of the documents, Bobbitt said that this was just a practice that she developed over time, but it was not something she was required to do.

Bobbitt never represented Alexander Friedmann as his attorney and never provided legal services to him. However, Friedmann did present himself to her office requesting notary services several times. Bobbitt testified that, to the best of her recollection, Friedmann came into the Gary

Temple Law Office for notary services approximately once per year over the span of four or five years. She stated that Friedmann willingly handed documents over to her for notarization and never asked that she secure the copies she made or keep them confidential in any way.

Bobbitt only vaguely recalled the documents that she had notarized for Friedmann. She initially testified that she had a specific recollection of notifying Friedmann that she would maintain a copy of the documents that she notarized for him. On cross-examination, she clarified that she does not specifically remember telling Friedman that she would make a copy of his documents, but she reiterated that it was her practice to tell every person seeking notary services that she would keep a copy of the notarized documents and the person's identification. In addition, in her view, Friedmann necessarily would have been aware that she copied documents based on his seeing her do it the first time he asked her to notarize a document, and he kept coming back, even though he knew the procedure. He never objected to this practice.

Bobbitt also explained that, if a person came in to have documents notarized, he usually came in the front door of the office. In the reception area of the office is a desk where she often worked and where she notarized documents. Once she notarized a document, she would take the original and the person's driver's license to be copied. The copier was in the next room but visible from the front room, such that the person whose document was notarized could see Bobbitt making copies. After copying the driver's license and the document, Bobbitt would return to the front room and hand the individual his original document and his identification. She would also staple together the pages of any multi-page document while at her desk, and the person would see her do this. She testified that, even if Friedmann had not known in advance that she was going to copy his documents, he would have seen her copying them from his position in the reception area of the office and would also have seen her staple the copy of the document in his presence.

Bobbitt believed she had seen on the news that Friedmann had been arrested. At some point, she was contacted by the MNPD about whether she might have in her possession documents that she had notarized for Friedmann. She indicated that she did but would only be willing to turn them over pursuant to a subpoena. The MNPD presented her with a judicial subpoena, in response to which she produced from her regularly kept business records the documents that Friedmann had had notarized and that she had maintained in her files.

On cross-examination, Bobbitt confirmed that she had not contacted the MNPD and was not sure how the police knew that she had maintained copies of documents that she had notarized for Friedmann. She did not know whether the police had talked to Gary Temple independently of her. She acknowledged, however, that Temple would have been aware that she kept copies of all of the documents that she notarized. She did not believe anyone else knew that she had notarized documents for Friedmann, but she acknowledged that Temple could have been there. She never asked Temple if he had contacted the police after Friedmann was arrested.

Upon being recalled to the witness stand at the court's request, Bobbitt further stated that, when the police first contacted her, they asked her if Friedmann had been in the office and, if so, what his purpose had been. She told them that he came in asking her to notarize documents and that all she had done for him was notarize documents. The police knew she was an attorney, and Bobbitt stated that, if Friedmann had been a legal client, she would have told the police as much. From her perspective, it would have been clear from what she said to the police that all she had done for Friedmann was notarize documents on several occasions.

To rebut Bobbitt's testimony, the defendant first called Stephanie Alexander, a private investigator, who testified that she went to the Gary Temple Law Office to look at the reception area and see where the copier is. She also took some photographs. According to Alexander, a

person entering the front door of the Gary Temple Law Office would immediately encounter the reception desk. The wood and glass-paned double-door to Gary Temple's office is to the left, beyond the reception desk. According to the photographs taken by Alexander and entered into evidence by the defendant, the copier appears to be immediately to the right of the entrance into Temple's office, behind one of the double doors but visible through the glass. Alexander testified that a person standing in the reception area, just inside the entrance, would be able to see someone standing at the copier but would not necessarily be able to see what they were doing. She also indicated that, depending on where the person was standing in the reception area, he might not be able to see the copier.

Defendant Alexander Friedmann also testified about these issues. He acknowledged that he had had several documents notarized at the Gary Temple Law Offices over the course of several years, including, specifically, the Letter of Authorization, as well as an advance healthcare directive, a power of attorney for his wife, and similar documents of a personal nature. None of these documents was prepared by an attorney at the Gary Temple Law Offices, and Friedmann never asked for legal advice of any kind from the Gary Temple Law Offices, concerning the documents he had notarized or otherwise.

Bobbitt was the person who notarized his documents each time he was there. Friedmann denied, however, that Bobbitt ever told him that she would make copies of his documents and further denied that he ever saw her make copies or that he was aware that she ever made copies of his documents. He claimed that, if she had told him she would make and keep copies, he would have questioned the practice and would have objected or gone elsewhere. In his experience with having documents notarized elsewhere, it is not common practice for notaries to keep copies of the documents they notarize. According to Friedmann, when he entered the office, he would sit at

a chair in front of the reception desk and could not see the copy machine from where he was sitting, even if it might have been possible to see the copier from other positions within the reception area.

He understood that, after notarizing his documents, Bobbitt would make a copy of his identification, but he denied that he would have seen that she was holding copies of his documents after she returned from making a copy of his identification. He claimed that he would only have seen that she had a copy of his driver's license and would not have seen what other documents might have been underneath it.

On cross-examination, Friedmann conceded that he voluntarily handed his documents to Bobbitt for notarization. He did not tell her not to read them, and it never occurred to him to tell her not to copy them. In his experience, notaries do not usually read documents; they just witness a signature and then notarize the signature. However, he acknowledged that she could have read the Letter of Authorization—a single-page document—and told someone else about it, and he never instructed her not to tell anyone about it. He also acknowledged that, while she was notarizing his documents and making a copy of his driver's license, he never paid very close attention to what she was doing or what she had in her hands when she returned his documents to him. He agreed that it was fair to say that he was not very worried about her viewing the contents of his documents.

### 2. Testimony Concerning the Search Warrant for 270 Tampa Drive

In support of the warrant to search Building M at the condominium complex at 270 Tampa Drive, the government called Greg Hall as a witness. Mr. Hall testified that he lives at 270 Tampa Drive and was aware that Alex Friedmann owned four units at the complex. Hall is in the business of remodeling, repair, and maintenance, and he had the use of a large storage area under what is known as Building M at the complex. He uses the area as a workspace and to store equipment.

Friedmann approached him some time in 2017 or 2018 about using a portion of Hall's space himself. Hall agreed, and he built Friedmann a separate "room" inside the bigger storage area, using concrete blocks. Friedmann's storage room had a door that locked. Once Hall finished building the storage room, he handed the only set of keys to the door to Friedmann. After that, Hall did not have access to Friedmann's storage room. Friedmann paid Hall to build the room, and, after it was built, he sublet the space from Hall.

In February 2020, Hall heard that Friedmann had been arrested. He recalled that Friedmann had called him shortly after his arrest to tell him that his phone had been confiscated and to give him his new number. Several days later, Friedmann knocked on Hall's door to tell him he had gotten a van stuck in the mud and to ask for Hall's help in getting it out. Hall went with him and found that Friedmann had a "typical" U-Haul cargo van stuck in the mud just outside the entrance to the Building M storage area.

By that point, Friedmann had told Hall that his legal situation was becoming precarious and that he really needed to get the contents out of his storage room and into a permanent location before he was arrested again. Hall's impression was that Friedmann was trying to get his affairs in order, in anticipation of being arrested again in the next day or two. Because Friedmann appeared to feel some urgency in getting his stuff moved out of his storage room, and it was clear to Hall that they were not going to be able to get the van unstuck, Hall took Friedmann to a U-Haul store to pick up another van. Hall then asked Friedmann if he needed any more help, but Friedmann said no.

Later that afternoon, as Hall was returning tools to the storage area, he encountered Friedmann trying to move a heavy crate up the stairs. Hall offered to help him, but Friedmann declined his offer again. Hall nonetheless picked up one end of the crate and helped Friedmann

get it up the stairs. Friedmann put the crate in the van himself, but Hall could see what appeared to be two layers of crates stacked inside the van already. Hall could not say how many crates there were. Regarding the crate he helped Friedmann carry up the stairs, Hall estimated that it was approximately two feet by three feet in dimension, and eighteen inches tall. It weighed seventy-five to eighty pounds or more and was secured by three padlocks. Friedmann did not tell him what was in it, but he had previously told Hall that he intended to store legal documents in his storage room. Hall assumed that the crate held legal documents.

Hall testified that, after he helped move what was apparently the last crate, Friedmann told him that he had left a few things in his storage room and that Hall could have whatever was there. Friedmann also gave Hall the keys to the room. Hall understood that Friedmann was relinquishing the space back to him. There was only one set of keys, and Hall had not had access to the room since he had first given the keys to Friedmann after he built the room.

On cross-examination, asked whether Hall understood Friedmann's giving him the keys as a temporary thing, Hall confirmed that he did not understand it to be temporary. Instead, it seemed to Hall that Friedmann had moved out for good, even though Friedmann never expressly said as much to him. Hall conceded that Friedmann did not ask him to clean out the space or say that he was never coming back. However, according to Hall, Friedmann also did not tell him that he was coming back or that he would want the keys back at some point, and he expressly told Hall that he could keep whatever was left in the storage room.

One day not long after Friedmann had moved out, six law enforcement officers—MNPD detectives, TBI agents, and FBI agents—appeared at Hall's door, asking him where the storage space was. Hall asked them to be more specific, and the officers asked about Friedman. Hall told them he knew Friedmann and showed them where Friedmann's storage room was. Hall also told

them about his interactions with Friedmann concerning the storage room and that Friedmann had given him the keys to the space. The officers asked Hall if he would consent to their entering the storage room. Hall told them he did not mind but asked whether they needed a warrant or something.

Hall explained that, if the officers had insisted on entering the space without a warrant, he would not have had a problem with it, particularly because he had been in the space after Friedmann vacated it and knew there was nothing much in there. He did not feel coerced or threatened in any way, though he admitted it was "impressive" to open his door and find law enforcement officers from three different agencies all lined up in front of him. He maintained, however, that he felt free to withhold consent—to say either yes or no—when they asked for consent to search the space. Regardless, after discussion among themselves, the officers apparently decided the better course of action would be to obtain a warrant. After they obtained the warrant and presented it to Hall, they proceeded to search what had been Friedmann's storage room. Nothing of significance was found in the search.

Friedmann also testified about the storage room. He acknowledged that he had paid Hall $5,000 to build the storage room and then paid him $20 per month to sublease the space. The keys Hall gave him after building the room were the only keys to the room, so, until Friedmann gave the keys back to Hall shortly before he was arrested the second time, Hall never had a key to the storage room. Friedmann claimed that he gave the keys to the storage room to Hall in case Hall needed to get in there on a temporary basis, until Friedmann made bail, because he knew that he was going to be arrested soon. Friedmann did not remember his precise words, but he believed he had said something to Hall like, "Here are the keys in case you need to get in." Friedmann thought

he would be bonded out soon after his second arrest, but he did not really know how long he would be in jail.

Friedmann denied telling Hall that he could have whatever was in the storage room. Rather, according to Friedmann, he specifically told Hall he could have a paintball gun and a BB gun that he had left in there. Friedmann stated that he had left a "fair amount of property" in the space, including a fan, a heater, a hot plate, eating utensils, bedding, some furniture, food and water, and other items. He claimed that he did not intend to abandon these items or give them to Hall. He just made a conscious decision of what to move out before he was arrested. His main reason for moving things out of the storage space was that he did not own the space and did not have control over it; he subleased it from Hall who leased it from the condominium association. He conceded that he did not have control over or own the space to which he moved the crates either; his friend did.

On questioning by the undersigned, Friedmann stated that he did not discuss with Hall the matter of paying the rent for the storage room after he was arrested; he figured he would "cross that bridge when [he] got to it." He also agreed that, before giving Hall the keys that day in February 2020, Hall had never previously had any reason to go into the storage room on his own for anything.

## III.   DISCUSSION

### A.   Motion to Suppress Fruits of Judicial Subpoena

The Judicial Subpoena for production of Friedmann's notarized documents (Doc. No. 42-1, at 2) was issued under the authority of Tenn. Code Ann. § 40-17-123, which outlines the procedure law enforcement officers are to employ to obtain a subpoena for the production of books, papers, and other records for the purpose of "establishing, investigating or gathering evidence for the prosecution of a criminal offense." *Id.* § 40-17-123(a). In particular, the officer who "has reason to believe a criminal offense has been committed or is being committed and that requiring the

production of documents or information is necessary to . . . aid in the investigation and prosecution of the person or persons believed to have committed or believed to be committing the offense" is to prepare an affidavit in support of the request to compel the production of documents or other items. *Id.* § 40-17-123(b). The affidavit must "state with particularity":

> (1) [T]hat a specific criminal offense has been committed or is being committed and the nature of the criminal offense;
>
> (2) The articulable reasons why the law enforcement officer believes the production of the documents requested will materially assist in the investigation of the specific offense committed or being committed;
>
> (3) The custodian of the documents requested and the person, persons or corporation about whom the documents pertain;
>
> (4) The specific documents requested to be included in the subpoena; and
>
> (5) The nexus between the documents requested and the criminal offense committed or being committed.

*Id.* § 40-17-123(c). In addition, the statute specifies that "[n]o subpoena for the production of documentary evidence . . . shall be directed to, or served upon, any defendant, *or that defendant's counsel*, to a criminal action in this state." *Id.* § 40-17-123(i) (emphasis added).

In his Motion to Suppress the documents produced by the Gary Temple Law Office, in particular the "Letter of Authorization" referenced above, Friedmann argues, first, that the Application for a Judicial Subpoena failed to comply with Tenn. Code Ann. § 40-17-123, because it does not state with any particularity the "articulable reasons" why the officers believed that the documents being requested would "materially assist in the investigation"; does not provide any "nexus between the documents requested and the criminal offense committed or being committed"; and is overbroad, insofar as it requests "all copies of notarized letters . . . pertaining to Alexander Friedmann" for the preceding six years. (Doc. No. 42, at 5 (citing Tenn. Code Ann. § 40-17-123(c)(2), (4), & (5)).) Friedmann also implies that the Judicial Subpoena was issued in

violation of subsection (i) of the statute, because he was a client or "customer" of the Gary Temple Law Office, and, even if he was not a client, the police failed to ascertain his status or to verify whether the Gary Temple Law Office had prepared the documents prior to serving the subpoena.

The defendant also argues that the subpoena violates his Fourth Amendment rights because: (1) he had a reasonable expectation of privacy in the documents he had notarized at the Gary Temple Law Offices; (2) the Application for Judicial Subpoena did not adequately provide a nexus between the alleged crime and the place to be searched or the items to be seized and, therefore, was not supported by probable cause; (3) the information provided in support of the subpoena was "stale" (Doc. No. 42, at 12); and (4) the good faith exception to the exclusion of the documents procured by the subpoena does not apply. Friedmann further maintains that all "derivative information" obtained by the police as a result of having first obtained the notarized documents—in particular the Letter of Authorization that led them, first, to the storage unit at 270 Tampa Drive and eventually to the weapons stored at 2862 Whites Creek Pike—should all be suppressed under the "fruit of the poisonous tree doctrine" first espoused by the Supreme Court in *Wong Sun v. United States*, 371 U.S. 471 (1963).

In its Response, the government largely sidesteps the defendant's substantive arguments. It asserts simply that the third-party doctrine established by the Supreme Court in *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442, U.S. 735 (1979), applies to the defendant's actions, as a result of which his claim that he had a reasonable expectation of privacy in the documents he handed over for notarization is "dead in the water." (Doc. No. 69, at 4.) The government also argues that the defendant's reliance on *United States v. Carpenter*, 138 S. Ct. 2206 (2018), is misplaced, as the holding in that case is narrow and its facts are not remotely similar to those presented here.

In *Miller*, the defendant moved to suppress copies of checks and other bank records obtained by means of an allegedly defective subpoena served on two banks at which the defendant held accounts. The Fifth Circuit found that the defendant's Fourth Amendment rights had been violated when the bank records were obtained by means of a defective subpoena. The Supreme Court reversed, holding simply that the defendant had "no protectable Fourth Amendment interest in the subpoenaed documents," which consisted largely of check copies, deposit slips, financial statements, and bank statements. *Miller*, 425 U.S. at 437, 438. The Court found that these documents did not "fall within a protected zone of privacy," principally because, "[o]n their face, the documents subpoenaed here are not respondent's 'private papers.'" *Id.* at 440. The defendant had neither "ownership nor possession" of the documents; instead, the documents were "the business records of the bank." *Id.* Moreover, as the Court noted, banks are not "neutrals in transactions involving negotiable instruments, but parties to the instruments with substantial stake in their continued availability and acceptance." *Id.* (citation omitted).

In addition, however, the Court observed that it had "held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.* at 443 (citing *United States v. White*, 401 U.S. 745, 752 (1971); *Hoffa v. United States*, 385 U.S. 293, 302 (1966); *Lopez v. United States*, 373 U.S. 427 (1963)).[2]

---

[2] *White* involved conversations intercepted through a wire worn by a confidential informant; *Lopez*, similarly, involved the recording of a conversation between a defendant and a third party, and *Hoffa* concerned the testimony of a government informant relaying conversations between the defendant and the informant or conducted in the informant's presence.

*Smith*, somewhat relatedly, held that a "pen register" installed by a telephone company at its central offices, at the request of police, to record the numbers dialed from a telephone at defendant's home, did not constitute a "search" within the meaning of the Fourth Amendment. Although the defendant had a legitimate expectation of privacy in actual telephone conversations, he did not have a realistic expectation of privacy in the telephone numbers he dialed and, even if he did, his expectation was not legitimate. The Court concluded that consumers typically know that they must convey telephone numbers to the telephone company in order to dial them, that the telephone company has the ability to record that information, and that it does in fact record it for various legitimate purposes. Second, the court concluded that, by voluntarily conveying the information—the telephone numbers he dialed—to the telephone company, the defendant assumed the risk that the telephone company would convey it to the police. The Court reiterated that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith*, 442 U.S. at 743–44. In other words, as in *Miller*, the Court found both that the telephone numbers were not actually private information and that the defendant had voluntarily turned that information over to a third party.

It is this latter portion of the holdings in *Miller* and *Smith* on which the government relies, arguing that the defendant willingly turned over his notarized documents to Bobbitt, thus destroying any reasonable expectation that the documents would be subject to Fourth Amendment protection, regardless of whether Friedmann conveyed the documents to Bobbitt only for a limited purpose and with the unspoken expectation that she would maintain their privacy.

For his part, Friedmann insists that the facts of this case are more similar to those of *Carpenter* than to those of *Miller* and *Smith*. In *Carpenter*, the defendant moved to suppress "cell-site location information" (CSLI), and the Supreme Court held that an individual maintains a

legitimate expectation of privacy, for Fourth Amendment purposes, in the record of his physical movements and location captured through CSLI. *Carpenter*, 138 S. Ct. at 2217. The Court acknowledged that the "fact that [an] individual continuously reveals his location to his wireless carrier," just by carrying a cell phone, "implicates the third-party principal of *Smith* and *Miller*." *Id.* at 2217. It found, however, that, "while the third-party doctrine applies to telephone numbers and bank records," "cell-cite records" were "qualitatively different," and it "declined to extend *Smith* and *Miller* to cover these novel circumstances." *Id.* at 2216–17. The Court had already recognized that individuals have "a reasonable expectation of privacy in the whole of their physical movements." *Id.* at 2217 (citing *United States v. Jones*, 565 U.S. 400 (2012)). It likened the government's tracking of cell phone location to "attach[ing] an ankle monitor to the phone's user." *Id.* at 2218. And it rejected the government's argument that cell-site records are simply "business records" created and maintained by wireless carriers and, as such, excluded from Fourth Amendment protection by the third-party doctrine. *Id.* at 2219. Regarding that argument, the Court found that the

> Government's position fails to contend with the seismic shifts in digital technology that made possible the tracking of not only Carpenter's location but also everyone else's, not for a short period but for years and years. Sprint Corporation and its competitors are not your typical witnesses. Unlike the nosy neighbor who keeps an eye on comings and goings, they are ever alert, and their memory is nearly infallible. There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today. The Government thus is not asking for a straightforward application of the third-party doctrine, but instead a significant extension of it to a distinct category of information.

*Id.*

This court finds no analog between the facts of this case and those of *Carpenter*, which involved the unique circumstances of cell-site location information. The defendant's reliance on that case is entirely unwarranted.

To be sure, this case is distinguishable from *Miller* and *Smith* as well, on the basis that the documents at issue here are the type of "private papers," *Miller*, 425 at 440, in which the defendant, at least arguably, had a legitimate expectation of privacy, unlike the bank records and telephone numbers at issue in the earlier cases. At the same time, the court entirely credits Aimee Bobbitt's testimony that she routinely makes copies of the documents she notarizes and maintains them as business records in the ordinary course of her practice as a notary.[3] The court also credits her testimony that she, as a matter of common practice, always notifies the individuals whose documents she notarizes that she will maintain copies of both their driver's license and their notarized documents. Friedmann may not have been intentionally lying when he testified that Bobbitt never told him she was keeping copies of his documents and that he never noticed that she had any such copies in her hand when she returned his original documents and driver's license to him. Rather, it may simply be that Friedmann did not attach much importance to the privacy of the documents he was having notarized or pay close attention to what Bobbitt was telling him or doing while he was in her office. He testified, in fact, that it was fair to say he was not paying close attention, because he was not worried about Bobbitt's reviewing the contents of his documents.

Specifically as regards the Letter of Authorization, this single-page document is notarized just below the signature of Alexander Friedmann. Any person notarizing the document would have had no trouble reading it at a glance. Friedmann testified that he did nothing to convey to Bobbitt that the document was confidential; he did not ask her to maintain its secrecy or prevent her from copying it. Accordingly, even if he did not actually know that Bobbitt copied and maintained a copy of the document, Friedmann, by willingly and voluntarily handing it over for her to notarize

---

[3] The undersigned, having been a notary at one time, sees the value of this practice, as the notary maintains her own record of what she notarized, thus discouraging fraudulent use of her notarizations.

and by not maintaining control over the document when Bobbitt left to make copies, relinquished whatever expectation of privacy in the document he might otherwise have had. Under *Smith* and *Miller*, Friedmann had "no legitimate expectation of privacy in information he voluntarily turn[ed] over" to Bobbitt, a third party. *Smith*, 442 U.S. at 743–44.[4]

Finally, the court also credits Bobbitt's testimony that she told the police, when they first contacted her, that the only service she had performed for Friedmann was to notarize some documents for him. As a result, the police had no reason to believe that she had ever acted as his attorney and did not act in contravention of Tenn. Code Ann. § 40-17-123(i)—which prohibits service of a subpoena on a defendant's counsel—by serving the subpoena on the Gary Temple Law Office.

Because Friedmann voluntarily turned over his documents to a third party to copy and maintain, he had no legitimate expectation of privacy in the documents notarized by Aimee Bobbitt, and his Motion to Suppress the documents produced by the Gary Temple Law Office in response to the Judicial Subpoena will be denied.

### B.    Motion to Suppress Fruits of Illegal Search and Seizure from 270 Tampa Drive

In support of his Motion to Suppress Fruits of Illegal Search and Seizure from 270 Tampa Drive (Doc. No. 41), Friedmann asserts, first, that the police only learned about the storage room at 270 Tampa Drive as a result of the procurement of documents from the Gary Temple Law Office pursuant to the illegal Judicial Subpoena, and he argues that the Search Warrant for 270 Tampa Drive and any evidence retrieved through its execution must be suppressed as "fruits of the

---

[4] Notably, although neither party discusses this aspect, it is apparent from the face of the document that the defendant intended for it to be presented to both Ferris Mar and Greg Hall, further suggesting that the defendant did not have a legitimate expectation of privacy in the document.

poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471 (1963). Having concluded that Friedmann has no basis for objecting to the Judicial Subpoena, the court rejects this argument.

Friedmann also argues that the Search Warrant for 270 Tampa Drive (1) is overbroad, insofar as it contains *no* description of the items the MPD believed would be seized during the search and, instead, contains only a description of the place to be searched; (2) makes no attempt to allege a nexus between the crimes charged (burglary and vandalism) and the place to be searched; (3) is based on stale information; and (4) willfully omitted important information relevant to the determination of probable cause. He also argues that the warrant is not saved by the good-faith exception and that anything found during the search and seizure must be excluded from evidence. Anticipating the government's arguments, Friedmann also argues that Greg Hall lacked actual or apparent authority to grant consent to the search of the storage room.

The government, in response, argues that (1) the defendant abandoned the place to be searched, thus relinquishing any reasonable expectation of privacy in it; (2) Greg Hall had both actual and apparent authority to consent to the search and did grant such consent; and (3) even if the warrant is facially invalid, the officers executing the warrant acted in good faith in relying on it.

### 1.    *Legal Standard: Abandonment*

Generally, neither a warrant nor probable cause is required to seize and search property that has been abandoned. *Abel v. United States*, 362 U.S. 217, 241 (1960). The Supreme Court and the Sixth Circuit recognize this exception to the warrant requirement on the basis that the "protections of the Fourth Amendment extend only to places and items for which a person has a reasonable expectation of privacy; no person can have a reasonable expectation of privacy in an item that she has abandoned." *United States v. Eden*, 190 F. App'x 416, 421–22 (6th Cir. 2006) (citing *Hester v. United States*, 265 U.S. 57, 58 (1924)).

The Sixth Circuit has explained that the term "abandonment," used in this context

> does not refer to traditional concepts of property law. The concept of abandonment considered in the present context is a Fourth Amendment issue and the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."

*United States v. Tolbert*, 692 F.2d 1041, 1044 (6th Cir. 1982) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). The question always raised by a Fourth Amendment objection is "whether governmental officials violated any legitimate expectation of privacy held by the [defendant]." *Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980)).

And that inquiry necessarily requires consideration of whether the individual has a "subjective" expectation of privacy that is "objectively" justifiable. That is, the court must determine

> whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy, whether, [that is], the individual has shown that he seeks to preserve [something] as private. The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable—whether . . . the individual's expectation, viewed objectively, is justifiable under the circumstances.

*Id.* at 1044 (quoting *Smith v. Maryland*, 442 U.S. at 741–42) (internal quotation marks and citations omitted).

In this case, then, the question of whether Friedmann "harbored a legitimate expectation of privacy" in the locked storage room requires analysis of (1) whether he, by his conduct, exhibited a subjective expectation of privacy in the storage room, after he emptied much of its contents and gave the only keys to Hall; and (2) if so, whether his subjective expectation of privacy is objectively justifiable. *Id.*

### 2.     *Friedmann Abandoned the Storage Room and Its Contents*

In undertaking that analysis, the court finds that the testimony produced at the hearing established, by a preponderance of the evidence, that Friedmann intentionally abandoned any interest in the storage room within Hall's larger storage area and, at the same time, relinquished any privacy interest in the room. By giving Hall the keys, knowing he was about to be arrested and with no instructions and no expression of an intention to return and retrieve them, and by telling Hall, in essence, that he had taken from the room everything that he intended to take and that Hall could have the rest, Friedmann, by his conduct, clearly communicated that he no longer had any subjective expectation of privacy in the storage room—nor any reason for maintaining the privacy.

Friedmann's testimony to the contrary was both conflicting and self-serving, and the court gives it no weight. Friedmann knew that he was about to be arrested, but he emphasized that he expected to make bail quickly. In light of that expectation, he would have had no real reason to give Hall the keys, particularly given that Hall had never before had any need to access what had been Friedmann's storage room. The court interprets Friedmann's act of giving the keys to Hall as Hall did: as a voluntary relinquishment of any proprietary interest in the storage room.

Because Friedmann abandoned the space before the search occurred, he did not have a reasonable expectation of privacy in the space and no legitimate basis for objecting to the warrant or the search itself. Friedmann's motion to suppress evidence procured from the storage room, therefore, will be denied.

### C.     **Motion to Suppress Fruits of Search of 7862 Whites Creek Pike**

The true focus of Friedmann's efforts to suppress evidence, of course, is the cache of firearms discovered at 7862 Whites Creek Pike, which resulted in the federal felon-in-possession charge. No testimony regarding the procurement or execution of that warrant was presented at the hearing. In support of his motion to suppress the firearms discovered in the course of that search,

Friedmann argues, again, that the search is the "fruit" of the illegal judicial subpoena and must be suppressed on that basis. The court, again, has already rejected that argument.

More substantively, Friedmann argues that the search warrant (1) is overbroad in that it lacks any description of the items to be seized and describes the property to be searched as the property belonging to the Marones rather than to Friedmann; (2) does not explain the nexus between the crime being investigated and the place to be searched; (3) is premised upon stale information; and (4) willfully omits crucial information and includes false or misleading information that would have affected the probable cause analysis, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). He also argues that the warrant is so facially deficient that it is not saved by the good-faith exception. The motion concludes with a statement that Friedmann believed "an evidentiary hearing will assist the Court in making a fair and proper determination of the issues raised." (Doc. No. 40, at 19.)

The government's Response addresses each of the defendant's substantive arguments. (Doc. No. 67.) The government does not respond to the defendant's request for an evidentiary hearing other than to point out that, although Friedmann alleges a *Franks* violation, he does not actually request a *Franks* hearing.

### 1. *Description of the Items to Be Seized*

Friedmann asserts that the warrant is facially defective, insofar as it contains no description whatsoever of the items for which the MPD was searching and believed would be seized. The government argues that the Search Warrant for 7862 Whites Creek Pike satisfies the Fourth Amendment, because it adequately incorporated by reference Detective Anderson's supporting Affidavit, which did contain a particularized description of the items to be seized.

The Search Warrant for 7862 Whites Creek Pike is, in fact, particularly sloppy. In the place on the form for the officer to insert a description of the "evidence to be searched for," the Search Warrant instead contains a description of the premises to be searched, as follows:

> [The property, land, dwelling, garage, sheds, detached buildings and any vehicles belonging to Ferris Marone located at 7862 Whites Creek Pike of Joelton, TN 37080-8867 [or] April Marone female white . . . .]

(Doc. No. 40-2, at 4.) The Affidavit submitted in support of the same Search Warrant contains the same error. It states:

> [T]he evidence to be searched for is as follows:
>
> - [The property, land, dwelling, garage, sheds, detached buildings, and any vehicles belonging to April Marone female white 09/30/1987 and Mr. Ferris Marone located at 7862 Whites Creek Pike in Joelton, TN 37080-89867]

(Doc. No. 40-2, at 1.) The same description is repeated in both documents in the space provided for identifying the place to be searched. (*Id.* and 4, 1.)

In addition, however, the Affidavit describes in substantial detail the evidence in the possession of the MNPD regarding Friedmann's unlawful entry into the DDC while it was under construction; his possession of a storage "bunker" at the Harding Glen Condos located at 270 Tampa Drive; the Letter of Authorization granting access to the storage room to "Ferris Mar" in the event of Friedmann's untimely death and stating that Ferris Mar had a key to the storage room; the MNPD's discovery that the full identity of "Ferris Mar" was Ferris James Marone; the MNPD's interview of Greg Hall and Friedmann's surrender of his keys to the storage room prior to his arrest later the same night; and Hall's description of Friedmann's removal of "approximately ten to fifteen" crates from Friedmann's storage room and into a U-Haul van the day of his arrest. (*Id.* at 1–2.) Hall described the crates as "black colored plastic crates with yellow lids," each measuring "approximately three feet long by two feet wide by two feet deep," weighing "approximately seventy-five pounds," and "sealed shut with three metal locks." (*Id.* at 2.) Hall told police that

Friedmann departed from the condominium complex in the U-Haul van carrying the crates "containing unknown items." (*Id.*)

The Affidavit also describes the affiant's conversation with April Marone of 7862 Whites Creek Pike on March 20, 2020. On that date, Marone told Anderson that Friedmann had asked her on February 17, 2020 if he could store "legal documents in her basement." (*Id.*) She agreed, and, sometime after that date, she noticed "items under a tarp in her basement that she believed to be items left by Friedmann." (*Id.*) The Affidavit continues:

> It is reasonable to believe that Mr. Friedmann, knowing his arrest was imminent on 02/18/20, desperately attempted to conceal the crates that possibly contained evidence that could incriminate him, by moving them out of his storage shed and storing them on the property of April Marone.

> If any of the above describe [sic] crates or any other items left by Mr. Friedmann or other items related the crimes [sic] he is suspected of committing in the jail are located on said property, items inside the crates could assist detectives in the investigation and prosecution of Alex Friedman in relation to the burglaries, trespassing, vandalism he is suspected of committing at the DCSO jail . . . and could possibly prevent any crimes Mr. Friedmann was planning to commit, *thus said crates will be photographed, inspected for content before being seized by MNPD*.

(*Id.* (emphasis added).)

The Affidavit was signed by Detective Anderson under penalty of perjury. Both the Affidavit and the Search Warrant were signed by Judicial Magistrate John R. Manson.

The Fourth Amendment plainly states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court has held that the Fourth Amendment "by its terms requires particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). At the same time, however, the Court recognized that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document

accompanies the warrant." *Id.* at 557–58. In *Groh*, the warrant did not incorporate other documents by reference, nor was it actually accompanied by "either the affidavit or the application," as these documents had been sealed. *Id.* at 558.

Following *Groh*, the Sixth Circuit has repeatedly reaffirmed the principle that an insufficiently specific warrant may be saved from invalidity if it incorporates by reference a sufficiently specific affidavit. *See, e.g.*, *United States v. Evans Landscaping Inc.*, 850 F. App'x 942 (6th Cir. 2021) ("In *Groh*, the Supreme Court authorized incorporation . . . ."); *Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 340 (6th Cir. 2006) (en banc) ("Consistent with *Groh*, all of the courts of appeals (save the Federal Circuit) have permitted warrants to cross-reference supporting affidavits and to satisfy the particularity requirement through an incorporated and attached document . . . ."); *Sanders v. Parrish*, 141 F. App'x 412, 416 (6th Cir. 2005) ("[N]either the *Groh* court nor the *Baranski* court invalidated the cure by incorporation principle.").

*Sanders*, in fact, is particularly instructive here. In that case, as here, the search warrant "described the premises to be searched in the appropriate section" but, "[i]n the section of the form intended to describe the items to be seized, the description of the premises to be searched was inadvertently duplicated." *Sanders*, 141 F. App'x at 413. "As a result, the search warrant did not include any description of the items to be seized." Moreover, as in this case, "[t]he same duplication of the description of the premises to be searched and omission of the items to be seized plagued the affidavit[.]" *Id.*

The officer seeking the search warrant stapled his own affidavit and that of a witness to the warrant and presented the stapled document to the magistrate judge. The officer told the magistrate judge that the "object of the search was marijuana." *Id.* The officer testified that the magistrate

judge appeared to read both affidavits before signing the warrant. The officer then met with the team of law enforcement officers prior to executing the search and told them that the object of the search was marijuana. *Id.* Marijuana was discovered during the search, and the homeowner was charged and convicted in state court based on items uncovered during execution of the warrant. On appeal, however, the warrant was invalidated and the conviction vacated. The homeowner then brought a civil suit in federal court for violation of his Fourth Amendment rights.

The Sixth Circuit rejected his claim and found that the case was not governed by *Groh*, as the warrant at issue, though lacking in particularity, was "cured" by the principle of incorporation. *Id.* at 416. Of particular importance in that case were the facts that the "curative documents" were attached to the warrant during the search, were "sufficiently incorporated into the warrant to search" the residence in question, and themselves "describe[d] with particularity the items to be seized." *Id.* at 416–17.

In the present case, there is no evidence in the record regarding whether Anderson's Affidavit was physically attached to the Warrant. More importantly, however, the issuing magistrate signed both the Affidavit and the Warrant, and the Affidavit expressly states that the items to be seized at 7862 Whites Creek Pike were the crates that Alex Friedmann had stored there.

The Warrant itself, while not a model of clarity, expressly cross-references the Affidavit through the use of the words, "Proof by Affidavit having been made before me." (Doc. No. 40-2, at 4).) Incorporation requires "'suitable words of reference' evidencing the magistrate's explicit intention to incorporate the affidavit.'" *United States v. Brown*, 49 F.3d 1162, 1175 (6th Cir. 1995) (citation omitted). At the same time, the "'realities of administration of criminal justice' . . . counsel against an overly exacting standard for determining when a warrant successfully incorporates a supporting affidavit," *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990), and "there

are no required magic words of incorporation." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 700 (9th Cir. 2009). Courts have deemed sufficient such language as "upon the sworn complaint made before me there is probable cause to believe," *United States v. Vesikuru*, 314 F.3d 1116, 1120–21 & n.4 (9th Cir. 2002), and "[s]ee attached affidavit," *Rivera Rodriguez v. Beninato*, 469 F.3d 1, 5 (1st Cir. 2006). *See United States v. Lazar*, 604 F.3d 230, 236 (6th Cir. 2010) (recognizing that "'[i]ncorporation' of one thing into another need not be by express 'reference'" and does not require "magic words" or "talismanic" phrases (citations omitted)).

Based on the Sixth Circuit's liberal application of the "cure by incorporation" principle, the court finds that the magistrate's reference to the Affidavit, in conjunction with his having actually signed the Affidavit that accompanied the Search Warrant, is sufficient to incorporate by reference the Affidavit into the Search Warrant. The Affidavit itself, despite not accurately describing the items to be seized in the appropriate section of the form, nonetheless describes in substantial detail the facts supporting probable cause and the specific items the police sought to seize—the plastic crates being stored at April Marone's residence at Alex Friedmann's request. The Search Warrant, therefore, is not invalid for failing to describe with adequate particularity the items to be seized.

      2.    *Willfully Including Misleading Information and Omitting Crucial Information*

The defendant also argues that, although the MNPD's notes summarizing the officer's interview of Greg Hall do not indicate that Hall described Friedmann's conduct as "frantic" or that he was acting with a noticeable "sense of urgency and desperateness," these descriptions were nonetheless attributed to Hall in Detective Anderson's Affidavit. (Doc. No. 40, at 15.)[5] In addition,

---

[5] The defendant has not provided any evidence of the contents of Hall's interview. Instead, he states—in a footnote—that he was "provided an audio recording of Mr. Hall's statement" and that an "informal transcript" of the interview and counsel's "review" of the audio recording

although Hall supposedly told the police that Friedmann told him that the crates Friedmann was moving from his storage room contained legal documents, that information was not included in the Affidavit.[6] Friedmann asserts that the MNPD officers were "aware of these important points and intentionally included, embellished, or omitted them as they saw fit in order to support their case for probable cause and in contravention of *Franks* [*v. Delaware*, 438 U.S. 154 (1978)]."

In response, the government asserts that the defendant has not shown that he is entitled to a "*Franks* hearing" and that his allegations do not establish either materially misleading statements or crucial omissions from the affidavit in support of the warrant.

The Sixth Circuit has explained that, to be entitled to a *Franks* hearing,

> the movant must provide a substantial preliminary showing that a false statement was made either knowingly or intentionally, or with reckless disregard for the truth. The movant must also show that the allegedly false statements were necessary for the magistrate's determination of probable cause. Therefore, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."

*United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (quoting *Franks*, 438 U.S. at 171–72).

In the case of alleged material omissions, a defendant is entitled to a *Franks* hearing if he "makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit," and "a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) (citation omitted). The

---

"indicate Mr. Hall did not use this phrasing to describe Mr. Friedmann's state on February 18th, 2020." (Doc. No. 40, at 15 n.11.)

[6] The Affidavit does, in fact, state that April Marone told police that Friedmann had asked her if he could store legal documents in her basement and that she agreed to his request. (Doc. No. 40-2, at 2.)

Sixth Circuit has also repeatedly held that "there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *Id.* (citations omitted). This higher standard applies because of "the potential for endless rounds of *Franks* hearings due to potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id*. at 415–16 (internal quotation marks and citations omitted).

In this case, Friedmann has not made a substantial showing that the allegedly false statement in the Affidavit in support of the Search Warrant (that Hall described Friedmann's demeanor the day he moved the crates as "frantic, with a sense of urgency and desperateness" (Doc. No. 40-2, at 2)) was actually false, in particular because he has not provided to the court any evidence of the content of the MNPD's interview of Hall or the officer's notes summarizing the interview. Moreover, Hall testified at the evidentiary hearing that Friedmann appeared to have a "sense of urgency," because he knew he was going to be arrested soon. And, even if he had not testified thus, Hall's description of Friedmann's conduct reasonably permitted the police officers to infer that Friedmann was acting with a sense of urgency.

Regardless, the defendant has made no attempt to show that this statement was material to the finding of probable cause or that probable cause would necessarily have been found lacking if the description of Friedmann's demeanor had been omitted. The court finds that it is not material and, in fact, had little or no impact on the question of whether the affidavit established probable cause for issuance of the Search Warrant.

The defendant's argument that the officer's intentional omission of Hall's statement that Friedmann told him the crates contained legal documents somehow made the Search Warrant invalid borders on the absurd. Hall, in fact, testified that Friedmann did not tell him what was in

the crates but that he assumed, based on previous conversations, that they contained legal documents. Obviously, they did not contain legal documents—they contained firearms. And even if Friedmann actually had told Hall that the crates contained legal documents, the police had no reason to believe that such a statement was true and no compelling reason to include it in the Affidavit.

In sum, Friedmann did not request a *Franks* hearing. Even if he had, he has not made the showing required to be entitled to a *Franks* hearing. And he has not shown that the purportedly false statements in, or omissions from, the Affidavit had any effect on the state magistrate's probable cause finding.

### 3. Staleness

Friedmann claims the information "provided to the MNPD that they then used to obtain the Search Warrant for 7862 Whites Creek Pike was stale at the time it was presented to the magistrate" and, therefore, "was inadequate as probable cause to support the search." (Doc. No. 40, at 11.) He points out that the application for the Search Warrant was made on March 20, 2020 after an interview with Greg Hall, in which Hall described events that had taken place a month previously, on February 18, 2020. April Marone, likewise, was interviewed on March 20, 2020, and the information she conveyed related to a conversation with Friedmann that had taken place on February 17, 2020. The defendant also argues that the Letter of Authorization, which was used to track down "Ferris Mar," was prepared in 2018, well before any of the events giving rise to Friedmann's arrests in connection with his unlawful activities at the DDC, and that the "alleged offenses at the DDC took place from approximately August of 2019 to the beginning of 2020," more than forty days before his activities at 7862 Whites Creek Pike. (Doc. No. 40, at 13.)

"[S]taleness is a concept that is meant to apply to information used for the issuance of a search warrant . . . ." *United States v. Archibald*, 685 F.3d 553, 556 (6th Cir. 2012). "Because

probable cause to search 'is concerned with facts relating to a presently existing condition,' there arises the 'unique problem of whether the probable cause which once existed has grown stale.'" *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quoting W. LaFave, *Search and Seizure* § 3.7 at 338–39 (3d ed. 1996)). When analyzing staleness, the court must consider the specific facts of the case in light of several factors, including (1) the character of the crime, (2) the criminal, (3) the thing to be seized, and (4) the place to be searched. *Archibald*, 685 F.3d at 558 (citation omitted); *see also United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009) ("[T]he expiration of probable cause is determined by the circumstances of each case and depends on the inherent nature of the crime." (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006))).

In considering whether probable cause exists at the time a judge issues a warrant, "the critical question is whether the information contained in the affidavit, when presented to the judge, established that there was a fair probability that evidence would still be found at the location of the search." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). Thus, "staleness" is different when considered in the context of crimes for which the evidence is likely to be rapidly dispersed and consumed, such as drug dealing and money laundering, and those for which it is not, such as child pornography. *See Lewis*, 605 F.3d at 402.

In this case, the evidence clearly was not stale. The evidence set forth in the Affidavit established that Friedmann asked permission from April Marone to store "legal documents" on her property on February 17, 2020 and that he moved the storage crates from the storage room to 7862 Whites Creek Pike on February 18, 2020, in anticipation of his arrest. The police officers learned this information on March 20, 2020. The officers also ascertained, upon talking to Marone, that the items Friedmann had stored in her basement were still there at the time they sought a warrant. There is simply no basis for finding that the information contained in the Affidavit presented to

the state magistrate had gone "stale" or that the crates the MNPD sought to seize were not still at 7862 Whites Creek Pike.

4.      *Nexus Between the Criminal Conduct and the Place to Be Searched*

Friedmann argues that the warrant is invalid because it establishes no "nexus" between the placed to be searched (April Marone's residence at 7862 Whites Creek Pike) and the alleged criminal activity (burglary and vandalism at the DDC).

The Sixth Circuit has stated that, "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)). In other words, "the affidavit must suggest 'that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought' and not merely 'that the owner of the property is suspected of a crime.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

The Affidavit in this case explained that Friedmann had been seen on multiple occasions entering the DDC while it was under construction, dressed as a construction worker, with a dust mask over his face in an effort to hide his identity, carrying a clipboard and a bucket with what appeared to be tools inside, but he was not employed in any capacity by any contractor or subcontractor working on the building and had no legitimate basis for being inside the facility. He had been arrested and charged with attempted burglary, possession of burglary tools, and tampering with evidence. The officer who sought the search warrant believed that additional evidence relating to the crimes of burglary and vandalism would be present on the premises at 7862 Whites Creek Pike, based on Friedmann's having deposited there the same triple-locked

plastic crates that he had been seen removing from his storage room at 270 Tampa Drive shortly before his arrest. The Affidavit noted that Greg Hall believed, based on Friedmann's demeanor, that the items in the crate were of "utmost importance and value to Mr. Friedmann." (Doc. No. 40-2, at 2.) The Affidavit explained why the officer believed that the crates "containing unknown items" were stored at 7862 Whites Creek Pike and that the officer believed that Friedmann was "desperately attempting to conceal the crates that possibly contained evidence that could incriminate him, by moving them out of his storage shed and storing them on the property of April Marone." (*Id.*)

The evidence presented in the Affidavit was clearly sufficient to establish a link between Friedmann, the storage crates, and 7862 Whites Creek Pike. The question of whether those items were linked to illegal activity presents a closer call. However, as the government argues, it was clear that Friedmann was engaged in some kind of nefarious activity, even though it was not entirely clear to the government, at the time the Search Warrant was issued, what, exactly Friedmann was doing while he was illegally on the premises of the DDC construction site. The fact that he was hurriedly moving crates from his storage room to a place where they would be less likely to be found by law enforcement the very day he expected to be arrested again reasonably gave rise to suspicion that the crates were related to his illegal activities. The court finds that the Affidavit sets forth an adequate nexus between the defendant, his criminal activity, and the place to be searched.

5.     *Leon's Good Faith Exception*

The court also finds that, apart from whether the Affidavit contained enough information to establish a sufficient nexus between the place to be searched and the alleged criminal activity, the Motion to Suppress must be denied under the good-faith exception to the exclusionary rule, established by *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905. This rule constituted a "break from the previously reflexive and uncompromising approach of excluding all evidence seized without probable cause." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). Following *Leon*, a district court presented with a motion to suppress claiming a lack of probable cause must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *Leon*, 468 U.S. at 923 n.23). "Only when the answer is 'yes' is suppression appropriate." *White*, 874 F.3d at 496. Generally, however, the courts are to accord "great deference" to a magistrate judge's finding of probable cause and decision to issue a warrant. *Leon*, 468 U.S. at 914.

To assist courts in resolving whether the good-faith exception applies, *Leon* outlined four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable and the evidence procured by it should, therefore, be excluded: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role" and served "merely as a rubber stamp for the police"; (3) where the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause"—that is, where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 914–15, 923 (quotation marks and citations omitted).

Friedmann argues that all of these circumstances are present here, as a result of which the evidence obtained pursuant to the Search Warrant executed at 7862 Whites Creek Pike must be excluded. Regarding the first circumstance, the court has found no evidence of false information in, or of material omissions from, the Affidavit or Search Warrant.[7]

Regarding the second circumstance, the defendant argues that the state magistrate clearly signed the Search Warrant without actually reading it, because any judicial officer who had actually read it would have seen the glaring error in the description of the items to be seized. (*See* Doc. No. 40, at 17.) As the court has already discussed, however, the state magistrate signed both the Affidavit and the Search Warrant, and the Affidavit contained more than sufficient information to provide probable cause and to identify the items to be seized. The state magistrate's failure to notice the error in the section of the Affidavit and Search Warrant that contains primarily boilerplate language does not establish that he acted as a mere rubber stamp for the police.

Regarding the third *Leon* circumstance, the Sixth Circuit has explained that an affidavit that is

> so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit. A bare-bones affidavit, in turn, is commonly defined as one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed. It provides nothing more than a mere guess that contraband or evidence of a crime would be found, either completely devoid of facts to support the affiant's judgment that probable cause exists, or so vague as to be conclusory or meaningless.

---

[7] The defendant simply cross-references his prior argument regarding "intentional substantive omissions . . . as well as inaccurate and false inclusions in violation of *Franks*" (Doc. No. 40, at 17), presumably meaning the omission of Friedmann's false statement that the storage crates contained legal documents and Detective Anderson's "falsely" attributing to Greg Hall a description of Friedman as "frantic" and acting with a noticeable "sense of urgency and desperateness," an argument the court has already rejected.

> In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains a minimally sufficient nexus between the illegal activity and the place to be searched. If the reviewing court is able to identify in the averring officer's affidavit some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable.

*White*, 874 F.3d at 496–97 (internal quotation marks and citations omitted). Notably, as the court also explained, a "bare-bones affidavit should not be confused with one that lacks probable cause." *Id.* at 497. "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.*

The Affidavit at issue in this case is far from a "bare bones" affidavit "completely devoid of facts" or consisting solely of "suspicions, beliefs, or conclusions." *Id.* at 496. Detective Anderson's Affidavit "contains sufficient factual content that, when taken together and read in a common-sense, practical manner, establishes some connection, some minimally sufficient nexus," between Friedmann's criminal activity, the crates removed from the storage room at 270 Tampa Drive, and the items Friedmann had stored at 7862 Whites Creek Pike. Even if the Affidavit itself does not actually provide an adequate nexus between Friedmann's suspected criminal activity and the storage crates, the supporting Affidavit was not bare-bones, and Detective Anderson's reliance on the Search Warrant is entitled to the benefit of *Leon*'s good-faith exception.

Likewise, as previously discussed, the court has found that the Search Warrant adequately incorporates the description of the items to be seized that is found in the Affidavit through use of the words "Proof by Affidavit having been made before me." (Doc. No. 40-2, at 4.) Even if not, the police officers' reliance on this language was not objectively unreasonable.

For this reason, too, Friedmann's Motion to Suppress Fruits of Illegal Search and Seizure from 7862 Whites Creek Pike (Doc. No. 40) must be denied.

**IV.     CONCLUSION**

For the reasons set forth herein, the three Motions to Suppress (Doc. Nos. 40, 41, 42) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge